**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Troy, | No. CV-20-01447-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| Equifax Information Services LLC, et al., | |
| Defendants. | |

Before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. 63) and Defendant Trans Union's Motion for Summary Judgment (Doc. 65). Both Motions are fully briefed and ready for review.[1] (Docs. 63, 65, 67, 69, 71, 74). For the reasons below, this Court grants Defendant Trans Union's Motion as to all of Plaintiff's claims and denies Plaintiff's Motion.

**I.     BACKGROUND**

This case arises out of alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. On July 22, 2020, Plaintiff James Troy filed a Complaint against Defendants Equifax Information Services LLC ("Equifax"), Trans Union LLC ("Trans Union"), and Jefferson Capital Systems LLC ("Jefferson Capital"). (Doc. 1). Equifax and Trans Union are two of the "Big Three" credit reporting agencies ("CRAs"), along with

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Experian. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2201 (2021). CRAs "compile[] personal and financial information about individual consumers to create consumer reports" and then sell those reports "for use by entities such as banks, landlords, and car dealerships that request information about the creditworthiness of individual consumers." *Id.* Jefferson Capital is a debt collection agency that furnishes data to CRAs. Equifax and Jefferson Capital have since been dismissed from the case, leaving Trans Union as the only remaining defendant. (Docs. 34 & 54).

Plaintiff's allegations concern his Trans Union credit file which showed Plaintiff's Jefferson Capital account—relating to an outstanding debt Plaintiff owed Verizon—with a notation of "acct info disputed by consumr." (Doc. 1 at 3). The notation can be traced back to January 23, 2020, when the parties agree that Plaintiff's credit repair company notified Jefferson Capital directly that Plaintiff disputed his account. (Docs. 66 at 5 & 70 at 6). In response, Jefferson Capital reported a dispute notation on Plaintiff's account. (*Id.*). Finally, Trans Union included the dispute notation in Plaintiff's credit file on the Jefferson Capital System tradeline. (Doc. 66-1 at 15).

In March 2020, Plaintiff sent a letter to Trans Union claiming that he no longer disputed his Jefferson Capital account and asking Trans Union to remove the notation of "accounts in dispute." (Docs. 66 at 6 & 70 at 6). While the parties dispute the exact course of events that followed, it is clear that Trans Union forwarded Plaintiff's consumer dispute—Plaintiff's "dispute" of the dispute notation—to Jefferson Capital, requesting that Jefferson Capital conduct its own investigation. (Doc. 1 at 3). Jefferson Capital verified to Trans Union that its reporting of the Jefferson Capital tradeline was correct. (*Id.*). Trans Union then "failed or refused to remove the notation of 'accounts in dispute.'" (*Id.* at 4).

After Trans Union failed to remove the dispute notation, Plaintiff filed the Complaint, alleging that Trans Union negligently (Count V) and willfully (Count VI) violated 15 U.S.C. §§ 1681e(b) and 1681i by issuing credit reports containing inaccuracies—that is, issuing credit reports that indicated Plaintiff disputed the Jefferson Capital account when he no longer did—and by failing to conduct a reasonable

reinvestigation into the matter after the inaccuracy was reported. (*Id.* at 9–11).

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id*. at 322–23. When considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorable to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

### B. The Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). In pursuing these goals, the FCRA "regulates the creation and the use of consumer reports by [CRAs] for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334–35 (2016) (citations omitted) (internal quotations omitted). "[T]he statute imposes on [CRAs] a panoply of procedural obligations and creates a private right of action for consumers to enforce compliance." *Gomez v. EOS CCA*, No. CV-18-02740-PHX-JAT (DMF), 2020 WL 3271749, at *2 (D. Ariz. June 17, 2020) (citing *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113–14 (9th Cir. 2017)). Two specific FCRA provisions are relevant in this case: § 1681e(b) and § 1681i.

FCRA § 1681e(b) requires CRAs to "follow reasonable procedures to assure maximum possible accuracy" of the information they place in an individual's consumer

report. If the accuracy or completeness of reported information is disputed by the consumer, FCRA § 1681i(a)(1)(A) requires the CRA to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item [of information] from the file. . . ." The reinvestigation must take place within thirty days of when the CRA receives notice of the dispute whether by direct notification from the consumer or indirect notification through a reseller, unless the exception for additional information applies. § 1681i(a)(1)(A).

### III.  ANALYSIS

The parties have filed cross motions for summary judgment. (Docs. 63 & 65). Trans Union seeks summary judgment as to all claims asserted by Plaintiff while Plaintiff seeks partial summary judgment on the issue of Trans Union's liability only. The below analysis focuses on Trans Union's Motion. Because this Court finds in Trans Union's favor, it need not address Plaintiff's Motion.

**A. Defendant Trans Union's Motion for Summary Judgment**

In its Motion, Trans Union asserts numerous arguments, including some which were previously rejected by this Court in relation to Trans Union's Motion for Judgment on the Pleadings. (Doc. 60). The Court will focus, however, only on Trans Union's standing argument. Trans Union argues that Plaintiff has failed to meet the first two elements of standing: injury-in-fact and causation. (Doc. 65 at 23). Specifically, Trans Union asserts that Plaintiff lacks sufficient evidence to show that he suffered a concrete injury *and* to show that any such injury was likely caused by Trans Union. (*Id.*). According to Trans Union, Plaintiff lacks evidence to support his claims that he was denied credit, charged higher interest rates, and suffered emotional distress. (*Id.* at 12–13). And even if he did suffer those harms, Trans Union argues Plaintiff has failed to show that those injuries were caused by its failure to remove the dispute notation from Plaintiff's credit file. (*Id.*).

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 141 S.Ct. at 2203. "For there to be a case or

controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). To show standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). If plaintiff fails in making this showing, "there is no case or controversy for the federal court to resolve" and the plaintiff's claims must be dismissed. *Id.* (citation omitted).

Here, Plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the elements of standing].")."Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted). Unlike at the pleading stage—where "general factual allegations of injury" may suffice—the summary judgment stage requires plaintiff to respond not with mere allegations, but by setting forth, by affidavit or other evidence, "specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation omitted).

In *TransUnion*, the Supreme Court held that "Congress's creation of a statutory prohibition or obligation and a cause of action does *not* relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *TransUnion*, 141 S.Ct. at 2205 (emphasis added). In other words, a plaintiff does not automatically establish standing by merely showing that the defendant violated a statute. *Id.* (citing *Spokeo*, 578 U.S. at 341). Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* As to the concrete injury requirement, the Court recognized that traditional "tangible" harms—such as physical harms, monetary harms, and harms to one's constitutional rights—"readily qualify" as concrete injuries-in-fact for standing purposes. *Id.* at 2204 (citing *Spokeo*, 578 U.S. at 341). Certain "intangible"

harms qualify as well, including reputational harms, disclosure of private information, and intrusion upon seclusion. *Id.*

The *TransUnion* Court ultimately found that a significant number of the plaintiff class members failed to show that they suffered a concrete harm that resulted from the defendant's alleged FCRA violations. *Id.* at 2212. In rejecting their claims of reputational harm, the Court held that inaccuracies in a consumer's internal credit file cause no concrete harm *unless* the file was transmitted or disclosed to a third party—thereby causing reputational harm. *Id.* at 2209–10. The Court also rejected the argument that the inaccuracies themselves harmed plaintiff class members by increasing the risk of *future* harm; the Court reasoned that such claimed injury was "too speculative to support Article III standing" and that the plaintiffs failed to "demonstrate a sufficient likelihood" that the inaccurate credit reports would be requested by, provided to, or otherwise released to third parties. *Id.* at 2212.

Here, Plaintiff attempts to distinguish his case from *TransUnion* by pointing to several harms that he suffered because of Trans Union's failure to remove the dispute notation from his credit file. (Docs. 69 at 15–17 & 71 at 10–11). Specifically, Plaintiff alleges that he suffered monetary harm, physical harm, and reputational harm. (Doc. 71 at 11). Trans Union argues that Plaintiff lacks sufficient evidence to prove these harms or to prove that they were caused by Trans Union's actions or inactions. (Doc. 65 at 12–13). The Court will address each alleged harm in turn.

First, as to monetary harm, Plaintiff alleges that he was denied credit and charged higher interest rates by various creditors. As evidence, Plaintiff refers the Court to his own deposition testimony. (Doc. 71 at 10). For example, Plaintiff testified that he was denied "[c]redit, money, anything, house, apartment, cars, everything" and that these denials were, in part, the fault of Trans Union. (Doc. 66-3 at 122). Plaintiff goes on to mention banks—Wells Fargo, Linden Mortgage, and "another bank that I can't remember"[2]—which he

---

[2] Trans Union appears to have identified this other bank as Southwest Stage Funding (Doc. 65 at 12, 14–15), though Plaintiff himself never specifically refers to Southwest

claims denied him mortgage loans. (*Id.* at 122, 146). Plaintiff's deposition testimony and interrogatory responses also assert that he was charged higher interest rates on three loans with American Finance and on an auto loan with Desert Finance. (*Id.* at 29, 132, 139).

Aside from Plaintiff's own deposition testimony, however, Plaintiff fails to offer any other evidence that the above-mentioned denials of credit or heightened interest rates actually occurred, let alone evidence that they were caused by or even related to Trans Union's failure to remove the dispute notation on Plaintiff's credit report. Plaintiff does not offer *any* documents, testimony, or other evidence from *any* of the creditors showing the details of or reasons for their respective denials or interest-rate determinations. In fact, Plaintiff fails to even mention the creditors by name in his briefing,³ instead continually opting for vague, broad assertions—supported only by Plaintiff's equally vague deposition testimony—that Plaintiff was "being turned down for anything" by creditors. (Docs. 69 at 10 & 66-3 at 122). Plaintiff's refusal to delve into any specifics related to the various creditors is particularly glaring given that the absence of damages or harm was put directly in issue by Trans Union. If Plaintiff was truly denied credit and given heightened interest rates because of Trans Union's allegedly inaccurate credit report, one would think that Plaintiff would be the first to provide the Court with the details—who, what, where, why, and how. Instead, Plaintiff expects this Court to not only take him at his word that these credit denials and high interest rates occurred, but that they were the result of Trans Union's failure to remove a small dispute notation from Plaintiff's credit file. The Court will not do so.

Moreover, Trans Union offers specific evidence undermining Plaintiff's assertions

---

Stage Funding by name in his briefing, statements of fact, deposition testimony, or anywhere else in the record.

³ In Plaintiff's Response (Doc. 69 at 10) and Reply (Doc. 71 at 10), Plaintiff states that he was turned down for mortgages by Linden Mortgage "and other places" as a result of his Trans Union credit report. *Nowhere else* in Plaintiff's briefing are *any* other creditors mentioned by name. Instead, the Court was made aware of the other creditors—Wells Fargo, American Finance, Desert Finance, and Southwest Stage Funding—only by Trans Union's briefing and by sifting through Plaintiff's deposition testimony on its own.

7

as to each creditor. For example, as to Wells Fargo, Trans Union offers the bank's denial letter (Doc. 66-4 at 1–7) which "clearly states that its decision was based upon a credit report from Equifax," not Trans Union. (Doc. 65 at 13). And as to Desert Finance's high interest rate on Plaintiff's auto loan, Trans Union points to Plaintiff's deposition testimony (Doc. 66-3 at 137), which indicates that his Desert Finance account was opened more than two years before the dispute notation was added to Plaintiff's Trans Union credit file. (Doc. 65 at 13). This shows that the dispute notation had nothing to do with Desert Finance's interest rate decision. Trans Union offers similar evidence undermining or even outright invalidating Plaintiff's claims as to the American Finance interest rates and the Southwest Stage Funding credit denial. (*See* Doc. 65 at 14). Tellingly, Plaintiff offers no evidence of its own to refute any of Trans Union's evidence and instead simply refers the Court back to Plaintiff's deposition testimony. (Doc. 69 at 10–11). Plaintiff has fallen well short of providing sufficient, summary-judgment evidence to show that he was monetarily harmed by Trans Union's actions or inactions.

Next, as to physical harm, Plaintiff alleges that he suffered from emotional distress—including stress, lack of sleep, and loss of appetite—"as a result in part of [Trans Union]'s refusal to correct its reporting of his account." (Docs. 69 at 10–11 & 71 at 11). Plaintiff also alleges he suffered "humiliation and embarrassment" after he was denied credit. (Docs. 69 at 10 & 71 at 10). To support this alleged harm, Plaintiff again cites only to his own deposition testimony and nowhere else. This Court recognizes, however, that in some cases deposition testimony alone is enough to support emotional distress damages. As Plaintiff points out (Doc. 69 at 10–11), Ninth Circuit law does not require substantial or even objective evidence to support emotional distress damages—a plaintiff's testimony alone may suffice. The Ninth Circuit made this clear in *Passantino v. Johnson & Johnson Consumer Products, Inc.*:

> While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in . . . the Ninth Circuit, or the Supreme Court. *See Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (upholding emotional damages based solely on testimony); *Johnson v.*

8

> *Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances); *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978) (noting that emotional distress damages are "essentially subjective" and may be proven by reference to injured party's conduct and observations by others).

212 F.3d 493, 513 (9th Cir. 2000). However, as this District has recognized, there remain some minimal evidentiary requirements that must still be met. "To survive summary judgment on an emotional distress claim under the FCRA, Plaintiff must 'submit evidence that reasonably and sufficiently explains the circumstances of his injury and does not resort to mere conclusory statements.'" *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1010 (D. Ariz. 2006) (citation omitted). "[A] plaintiff must support a claim for damages based on emotional distress *with something more than his or her own conclusory allegations.*" *Id.* (citation omitted) (emphasis added). Instead, a plaintiff must offer "sufficient evidence of the entire context in which the [FCRA violation] occurred, what the emotional injuries were, and how they were caused by the [FCRA violation]." *Id.*

Here, Plaintiff has failed to offer anything more than conclusory statements of his emotional distress injuries; Plaintiff does nothing to "reasonably and sufficiently explain[] the circumstances of his injury." *See Id.* As discussed above, Plaintiff offers no evidence showing that the credit denials or high interest rates—which, in turn, Plaintiff asserts caused his emotional distress—were the result of Trans Union's allegedly inaccurate credit report. And as discussed below, Plaintiff offers no evidence that Trans Union's allegedly inaccurate credit report was transferred to or obtained by the third-party creditors in the first place. It is true that Ninth Circuit law allows Plaintiff to prove emotional distress with his own testimony alone, but only to the extent that the emotional distress can actually be traced to Trans Union's actions or inactions. Because Plaintiff has failed to evidence the latter, his emotional distress testimony alone is insufficient to prove he suffered a concrete injury caused by Trans Union.

Finally, as to reputational harm, Plaintiff asserts that the alleged inaccuracies in his credit report "[did] not reflect [his] character and reputation regarding his creditworthiness

and his responsibly handling financial obligations." (Docs. 69 at 16 & 71 at 11). He alleges that he suffered "humiliation and embarrassment" when he was turned down by various creditors. (Docs. 69 at 10 & 71 at 10). However, Plaintiff's allegations of reputational harm are undermined by Plaintiff's lack of evidence showing that a Trans Union credit report containing the allegedly inaccurate dispute notation was actually transmitted to a third party. Without such evidence, Plaintiff has failed to show a concrete injury occurred. As the Supreme Court explained in *TransUnion*,

> [t]he standing inquiry . . . distinguishes between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors. The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm. In cases such as these where allegedly inaccurate or misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer. A letter that is not sent does not harm anyone, no matter how insulting the letter is. So too here.

*TransUnion*, 141 S.Ct. at 2210. At the summary judgment stage, the Court cannot merely accept as true Plaintiff's assertion that third-party transmission occurred; Plaintiff must instead come forward with "proof sufficient to create a material issue of fact." *See Baker v. Trans Union LLC*, No. CV 07-8032-PCT-JAT, 2009 WL 4042909, at *5–6 (D. Ariz. Nov. 19, 2009) ("At the motion to dismiss stage, the Court had to accept as true [the plaintiff]'s allegations that Trans Union provided Chase with an incomplete or misleading credit report. At the summary judgment stage, [the plaintiff] must produce proof sufficient to create a material issue of fact as to whether Trans Union actually provided an inaccurate credit report to Chase.").

Trans Union raised this issue—the lack of evidence showing third-party transmission—twice in the parties' briefing, once in its Response to Plaintiff's Motion (Doc. 67 at 10) and again in its own Motion (Doc. 65 at 11). Despite having at least these two opportunities to respond, Plaintiff failed to point the Court to any evidence refuting Trans Union's argument. Instead, Plaintiff offered only a Credit Karma report showing that

seven "credit inquiries" were made between February 18, 2020 and November 14, 2020. (Doc. 71 at 5 & Doc. 69 at 6–7). Upon reviewing the credit inquiries (Doc. 70-2 at 6–7), three can immediately be ruled out, as they occurred *after* the alleged inaccuracy was removed from Plaintiff's Trans Union credit file on August 20, 2020. (Doc. 66-1 at 6). This leaves the first four credit inquiries (February 18, June 2, August 3, and August 12) as possible instances in which a third-party creditor could have received Plaintiff's allegedly inaccurate credit report. The Court finds this evidence insufficient, however, because Plaintiff has failed to provide the Court with any detail as to what a creditor receives upon a "credit inquiry." Much of the Credit Karma report is redacted, and the "Credit Inquiries" section offers very little in the way of detail. Further, while the section titled "How to Read Your Credit Report" (Doc. 70-2 at 8–9) outlines what the "Credit Inquiries" section means, it does not explain what a third-party creditor sees when it conducts a credit inquiry. At the least, Plaintiff could have done some of this explaining himself in his briefing. Instead, Plaintiff made no effort to explain what a Credit Karma credit inquiry entails or includes. (Docs. 69 at 7 & 71 at 5).

If that weren't enough, Defendant contends—and Plaintiff does not refute—that Credit Karma is not a CRA, but merely a "tri-merge report" and a "consumer-facing platform for personal financial management." (Docs. 67 at 10–11 & 74 at 6–7). Defendant cites to caselaw distinguishing the two and to at least one case, *Zotta v. Nations Credit Financial Services Corp.*, in which the Eastern District of Missouri found that the plaintiff's FCRA claim failed "where there was 'no evidence that an Experian credit report—as opposed to a tri-merge report, which Experian did not issue—was seen by a third party.'" (Doc. 67 at 10–11 (citing *Zotta v. Nations Credit Fin. Servs. Corp.*, 297 F. Supp. 2d 1196, 1205 (E.D. Mo. 2003))). Similarly, this Court cannot find—based on a Credit Karma report alone—that a Trans Union credit report containing the alleged inaccuracy was actually transferred to a third-party creditor, let alone that the third-party creditor then made a credit or interest-rate decision based upon that inaccuracy. Thus, Plaintiff has failed to show sufficient, summary-judgment evidence that he was

reputationally harmed by Trans Union's actions or inactions.

Summary judgment in favor of Trans Union is appropriate because it has demonstrated that Plaintiff failed to make a showing sufficient to establish that he suffered a concrete injury caused by Trans Union—essential elements of standing on which Plaintiff bears the burden of proving. While Plaintiff alleges that Trans Union violated the FCRA by failing to use reasonable procedures to ensure the accuracy of its credit reports and by failing to adequately reinvestigate Plaintiff's credit report after being notified of an inaccuracy, Plaintiff has failed to provide sufficient evidence to support his allegations that he was injured as a result. Plaintiff has also failed to show that any harms he did suffer were caused by Trans Union's allegedly inaccurate credit file. As a result, Plaintiff's FCRA claims lack standing and must be dismissed.

## IV.   CONCLUSION

The Court grants summary judgment to Defendant Trans Union as to all of Plaintiff's FCRA claims. It follows that Plaintiff's Motion for Partial Summary Judgment (Doc. 63) as to Defendant Trans Union's liability is denied. Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 63) is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 65) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment and terminate this action accordingly.

Dated this 17th day of December, 2021.

Honorable Steven P. Logan
United States District Judge